

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00061-CV

_____

IN THE INTEREST OF A.E., P.E., AND Q.S. AKA Q.S., JR., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2021-1088-DR

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

The Department of Family and Protective Services filed a petition to terminate Mother's parental rights to her children, Allie, Porcha, and Quincy.[1] Following a bench trial, the trial court terminated Mother's parental rights after finding that (1) she knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, (3) she failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the children's return, as described in Section 161.001(b)(1)(O) of the Texas Family Code, and (4) termination of her parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (b)(2) (Supp.).

On appeal, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings that there were statutory grounds to terminate her parental rights and that doing so was in the children's best interests. We conclude that the evidence presented at trial supported the trial court's findings. As a result, we affirm the trial court's judgment terminating Mother's parental rights to Allie, Porcha, and Quincy.

## I. A Statutory Ground for Termination of Mother's Parental Rights is Supported by Legally and Factually Sufficient Evidence

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting

---

[1] We use pseudonyms to protect the identity of the children. *See* TEX. R. APP. P. 9.8.

*Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child[ren]'s best interest." *Id.* (citing Tex. Fam. Code Ann. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting Tex. Fam. Code Ann. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920

(Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002))); *see In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-

4

00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, '"the rights of natural parents are not absolute; protection of the child is paramount."'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

## B. The Evidence at Trial

Jaqueline Ibarra, a conservatorship specialist with the Department, testified that she received a report on June 20, 2021, that Mother had left her children at home alone. At that time, Allie was five years old, Porcha was two years old, and Quincy was five months old. According to Ibarra, there were also reports that Mother habitually paid thirteen- and fourteen-year-olds to watch the children, used alcohol and cocaine, underfed Quincy, and lived in a roach-infested home. Ibarra went to Mother's home to investigate the complaints and found Allie and Quincy alone.[2] Because she could not enter the home without an adult present, Ibarra called the Gladewater Police Department for assistance. Ibarra testified that the responding officer found Quincy in his blanket in a very hot room and brought him outside to her. Ibarra said Quincy smelled of feces and urine and was "very, very slim." She stated that she could "feel all his little bones. He didn't have any muscle mass." Even at five months, Quincy only weighed nine

---

[2]Porcha was staying with a family friend on that date.

pounds and twelve ounces and was diagnosed with malnutrition and "insufficient protein." Allie's face and feet were dirty, and she was hungry. According to Ibarra, the officer said there were roaches and insects throughout the home.

Ibarra and the officer were still present when Mother arrived home and began yelling. Ibarra testified, "[Mother] stated that she had gone out to a concert in Tyler, and that she had paid a teenager to go watch the kids. So, the fact that the kids were left alone was not her fault." Further conversations with Mother revealed that the concert occurred the night before and that she had spent the night with a boyfriend, overslept, and was just returning to the house around 7:00 p.m. Mother was arrested, and the Gladewater Police Department determined that the conditions of the home were too unsanitary to allow the children to remain there.

Kemetria Hill, a caseworker with the Department, testified that Mother was given a family service plan and obtained monitored return of the children on December 1, 2022, after completing all the tasks spelled out by the plan. However, Mother's conduct began to concern the Department soon after the monitored return and eventually led to the Department's decision to seek termination of her parental rights.

According to Hill, Mother missed four visits in January 2023 and became hard to reach. Hill testified that Mother refused to answer the door even when Hill saw her car parked outside and could hear the children in the home. Hill said Mother canceled a Department visit with the children on April 14 and "[did not] come to the door" during home visits on April 8, 22, and 29, which made Hill feel that Mother "was hiding something." This resulted in the Department issuing a new family service plan requiring Mother to attend counseling and complete a "Parents

6

as Teachers" class. Although Mother started counseling, she did not complete it because she was arrested for criminal trespass and a violation of community supervision.

Hill said Mother spent "[a] couple of weeks" in jail during May 2023 and missed visits after her release when Hill told Mother that her visits would be supervised by the Department. As a result, the children had not seen Mother for three months before trial. When asked how the children responded to the missed visits, Hill said that Allie "really [did not] care" and did not respond when Hill asked her about Mother. As for the visits Hill had observed with Mother, she testified that Mother "would be on her phone or she would keep [the children] occupied with her phone" for the "majority of the time" and would sometimes leave the visits early.

Kenneth Michael Reine, II, the laboratory manager and custodian of records for Quest Diagnostics, testified that Mother's August 25, 2021, drug test was positive for methamphetamine and that Mother also tested positive for methamphetamine and cocaine on April 7, 2022. Hill testified that Mother failed to submit to the Department's requested drug tests in (1) September, October, and November 2021; (2) March, June, and October 2022; and (3) January and April 2023.

According to Hill, Allie told her counselor that, during the monitored return, "her mother and dad were yelling and arguing and she cover[ed] her ears," but the man she referred to as "dad" was not her father and was unknown to the Department. Allie also told the counselor that Mother showed her and Porcha "the blood gang sign." Allie demonstrated "gang signs" for the counselor and told her that the signs meant "mission, blood[,] and drugs." Allie's foster mother

also testified that she witnessed the gang signs when Allie's counselor video chatted with her, and Porcha's foster mother said Porcha "threw up the blood sign" when she "was only three."

Mother was properly served but failed to appear for trial. Hill told the trial court that she had seen Mother exiting the courtroom on the day of trial and asked her where she was going. Mother indicated she would be back, but she did not show up for trial, which indicated to Hill that Mother was indifferent to what happened during the termination hearing.

Hill testified that the children could not be safely returned to Mother and that doing so would endanger the children's physical or emotional health. As a result, Hill testified that termination of Mother's parental rights was in the children's best interests. Sheka Howard, a supervisor for the Court Appointed Special Advocates (CASA) program, testified that CASA was satisfied with the children's placements and that she also believed it was in the children's best interests to terminate Mother's parental rights.

After hearing this testimony, the trial court terminated Mother's parental rights.

## C.     Sufficient Evidence Supports the Ground E Finding

By her first issue, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings under grounds D, E, and O. "Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)). Even so, when the trial court's findings under grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under at least one of those grounds. *See In re N.G.*, 577 S.W.3d

8

230, 237 (Tex. 2019) (per curiam) ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under [S]ection 161.001(b)(1)(D) or (E) of the Family Code."). This is because termination of parental rights under these grounds may implicate the parent's parental rights to other children. *Id.* at 234; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (Supp.) (providing as a ground for termination of parental rights that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)").

Ground E permits the termination of a parent's parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'[E]ndanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment . . . ." *In re E.N.C.*, 384 S.W.3d at 803. "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child[ren] or that the child[ren] actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923. Under ground "(E), it is sufficient that the child[ren]'s well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under [ground] (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v.*

9

*Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67.

Ground E "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied); *see In re N.S.G.*, 235 S.W.3d at 366–67. The endangering conduct may also occur "either before or after the child[ren]'s removal by the Department." *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.) (citing *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

"'Because it exposes the child[ren] to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under' Ground E." *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (quoting *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.)). "Drug use and its effect on a parent's life and his [or her] ability to parent may establish an endangering course of conduct." *Id.* (quoting *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.)); *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child[ren]."). In our analysis under ground E, we may also consider a parent's "failure to complete relevant requirements of [a] family service plan." *In re U.H.R.*, No. 07-18-

10

00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.); *In re Z.J.*, 2019 WL 6205252, at *11.

Here, clear and convincing evidence supported the trial court's conclusion that Mother engaged in an endangering course of conduct. The evidence showed that Mother attended a concert and left her young child, Allie, and her baby, Quincy, either home alone or overnight in the care of a teenager. Instead of returning home the following morning, Mother overslept and did not return until 7:00 p.m. As a result, the Department found Allie and Quincy dirty and hungry in a home that the Gladewater Police Department determined was bug infested and unfit to allow the children to remain. Quincy was so malnourished that it was clear that Mother had underfed him for a significant amount of time, which affected his physical health.

After obtaining a monitored return of the children, Mother stopped cooperating with the Department. The evidence showed she had taught Allie and Porcha gang signs and failed to comply with her family service plan by refusing to drug test or answer the door for Department home visits. Mother was jailed for weeks, exposing the children to temporary loss of a parent, and missed several visits with the children after her release. She also failed to comply with the provision of her family service plan that required her to complete counseling. On the day of trial, Mother showed up to court but left before the trial started.

Most importantly, Mother tested positive for methamphetamine two months after the Department filed its petition on June 21, 2021, and tested positive for methamphetamine and cocaine in April 2022. "A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under [ground] (E) even if there is no

11

direct evidence that the parent's drug use actually injured the child[ren]." *In re H.M.J.*, 2018 WL 3028980, at *5 (quoting *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287, at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (per curiam) (mem. op.)).

From the above-recited evidence, we conclude that the record firmly established that Mother engaged in a course of conduct that endangered the children's physical and emotional well-being. As a result, we find that legally and factually sufficient evidence supported the trial court's finding under ground E.

Since there was sufficient evidence supporting the trial court's finding under ground E, we need not review its findings under grounds D and O. *See J.T. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00070-CV, 2021 WL 2672055, at *9 (Tex. App.—Austin June 30, 2021, no pet.) (mem. op.); *In re M.F.*, No. 14-19-00964-CV, 2020 WL 2832166, at *8 (Tex. App.—Houston [14th Dist.] May 28, 2020, pet. denied) (mem. op.). We overrule Mother's first point of error.

## II. Sufficient Evidence Supports the Trial Court's Best-Interest Finding

Next, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interests. Because we disagree, we overrule Mother's last point of error.

### A. Standard of Review

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116

12

(Tex. 2006) (per curiam)). "Termination '"can never be justified without the most solid and substantial reasons.""" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child[ren], courts consider the following *Holley* factors:

> (1) the desires of the child[ren], (2) the emotional and physical needs of the child[ren] now and in the future, (3) the emotional and physical danger to the child[ren] now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child[ren] by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 819 (citing *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b).

The Department is not required to present proof of each *Holley* factor. *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re C.H.*, 89 S.W.3d at 27). "When considering the child[ren]'s best interest[s], we may take into account that a parent is unable to provide adequate care for [her] child[ren], lacks parenting skills, or exercises poor judgment." *Id.* (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child[ren]'s best interest[s]." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)). "The parent's . . . past performance as a parent [is] relevant in determining the child[ren]'s best interest[s]." *Id.* (citing *In re C.H.*, 89

S.W.3d at 28). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28.

### B.      Analysis of the *Holley* Factors

As for the first *Holley* factor, there was no direct evidence of Allie's and Porcha's wishes, and Quincy was too young to express his desires. Hill said that Allie had a good relationship with Mother but that Mother was not bonded with the children, although she cared for them. Hill testified that Allie was placed with James Williams and his wife, Brenetta, and Hill and Brenetta both testified that Allie was strongly bonded to the Williams family. Porcha was placed with her foster family, Zach and Tiffany Gilmore, had an exceptional bond with them, and called them mom and dad. Quincy was placed with his paternal grandmother. The evidence showed that all the children were thriving in their placements and received adequate educational, dental, and medical care. In light of the evidence, including that Mother had not visited with the children for three months before trial, we find that the first *Holley* factor weighs in favor of terminating her parental rights to the children. *See In re K.O.*, 488 S.W.3d 829, 842 (Tex. App.—Texarkana 2016, pet. denied).

As for the second and third factors, the young children's emotional and physical needs were great, but Mother presented an emotional and physical danger to the children. Allie was attending counseling after having been found dirty, hungry, and alone in Mother's care. Porcha "[was not] walking," was not potty trained, and "was delayed in her speech" but had "caught up" in the Gilmores' care. Quincy was originally malnourished and "had to attend occupational therapy" but was well cared for by his paternal grandmother. Hill testified that Mother's drug

14

use and conduct leading to jail time would prevent her from parenting appropriately and could expose the children to trauma. She also testified that the Department had no information to suggest that Mother had income or could provide a stable home. *See In re Z.M.*, 456 S.W.3d at 689 ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.))). We find that the second and third *Holley* factors favor terminating Mother's parental rights.

As to the fourth, seventh, and eighth *Holley* factors, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *Id.* (quoting *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."))). The evidence showed that Mother lacked parental ability. In addition to her actions that caused the initial removal of the children, Mother continued to use drugs during the pendency of the case and missed visitations with the children. When she did visit, she was often on the phone. There was also evidence showing that Mother's visits did not benefit the children. Brenetta testified that Allie was unaffected by Mother's missed visits, Tiffany testified that Porcha would have "regression in her speech and potty training" and would not sleep after visits, and Quincy was "very emotional" "[d]ue to the trauma" after his visits. Mother had also taught Allie and Porcha gang signs, demonstrating that the parent-child relationship with them was inappropriate. We find that the fourth, seventh, and eighth *Holley* factors weigh against Mother.

15

As for the fifth factor, the Department showed that Mother had initially completed all of her family service plan, but Hill said "[Mother was not] able to implement what she learned." According to Hill, after the monitored return, Allie said that Mother and an unknown man would argue and yell in her presence. Mother also failed to complete required individual counseling and a "Parents as Teachers" class that was necessary to obtain the children's return. Accordingly, this factor weighs against Mother.

As for the plans for the children, Mother failed to appear for trial and did not indicate what her plans were. Hill said that the Department planned on keeping the children with their current placements. Brenetta testified that her family would be willing to provide a "stable, loving, forever home" for Allie. Tiffany testified that her family loved Porcha and was willing to adopt her. Quincy's grandmother also testified that Quincy, two years old by the time of trial, was doing well and that she was willing to adopt him. The sixth *Holley* factor weighs in favor of terminating Mother's parental rights.

As for the remaining factor, the only excuse for Mother's actions was offered by Hill in relation to Mother's missed drug tests. Hill said that Mother claimed she did not have gas money or transportation, but Hill "would go get her and take her to drug test." As a result, Hill believed Mother's failure to test on several occasions showed a "clear intent to avoid the drug testing procedures when she refused to test." There was no excuse for Mother's positive drug tests. Consequently, we find that the ninth *Holley* factor weighs against Mother.

Considering the *Holley* factors, and in light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights

16

was in the children's best interests.  Therefore, we conclude that the evidence was sufficient to support the best-interest finding and overrule Mother's last point of error.

## III.    Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Chief Justice

Date Submitted:      November 17, 2023
Date Decided:        November 27, 2023